IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| **CANYON DUFF MOYE** | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | CIVIL ACTION NO.: |
| | * | 1:22-cv-00026-JB-B |
| **REOSHA BUTLER; MARY COOKS; WEXFORD HEALTH SOURCE INC.; and MANUEL POUPARINAS;** | * | |
| | * | |
| | * | |
| | * | |
| Defendants. | * | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW**

COMES NOW Plaintiff, by and through undersigned counsel, and files this Response in Opposition to Defendant's Renewed Motion for Judgment as a Matter of Law:

Under Rule 50 of the Federal Rules of Civil Procedure, a motion for judgment is granted only where "there is no legally sufficient evidentiary basis for a reasonable jury to find for the non-moving party." *Chaney v. City of Orlando, Fla*., 483 F.3d 1221, 1227 (11th Cir. 2007) (quoting *Lipphardt v. Durango Steakhouse of Brandon, Inc*., 267 F.3d 1183, 1186 (11th Cir. 2001) (internal quotations omitted). "[I]n deciding on a Rule 50 motion a district court's proper analysis is squarely and narrowly focused on the sufficiency of evidence." *Id*. The question before the court is simply "whether the evidence is legally sufficient to find for the party on that issue." *Id*. (quoting Fed. R. Civ. P. 50(a)(1) (internal quotations omitted); *see also Cleveland v. Home Shopping Network, Inc*., 369 F.3d 1189, 1192 (11th Cir. 2004) (stating that judgment as a matter of law should only be granted "when there is no legally sufficient evidentiary basis for a reasonable jury to find for the party on that issue").

The standard for reviewing a renewed motion for judgment as a matter of law under Rule

50(b) is the same as the standard for deciding a motion for judgment as a matter of law raised under 50(a) before the case was submitted to a jury. *WM Mobile Bay Env't Ctr., Inc. v. City of Mobile*, No. CV 18-00429-KD-MU, 2020 WL 6828027, at *1 (S.D. Ala. Nov. 20, 2020), aff'd, No. 20-14749, 2022 WL 2784606 (11th Cir. July 15, 2022) (quoting *McGinnis v. Am. Home Mortgage Servicing, Inc.*, 817 F.3d 1241, 1254 (11th Cir. 2016) (internal quotations omitted). "In considering whether the verdict is supported by sufficient evidence, the court must evaluate all the evidence, together with any logical inferences, in the light most favorable to the non-moving party." *Id*. (internal quotations and citation omitted). "[A]s [the courts] have stressed, [i]t is the jury's task—not [the court's]—to weigh conflicting evidence and inferences and determine the credibility of witnesses." *Id*. (citations and internal quotations omitted). "The court gives credence to evidence supporting the nonmoving party's case, as well as uncontradicted and unimpeached evidence supporting the moving party, at least to the extent that that evidence comes from disinterested witnesses." *Id*. (quoting *Hubbard v. Bank Atlantic Bancorp, Inc.*, 688 F.3d 713, 724 (11th Cir. 2012) (citation and internal quotations omitted)).

A "renewal of a motion for judgment as a matter of law under Rule 50(b) must be based on the same grounds as the original request for judgment as a matter of law prior to the case being submitted to the jury." *Id*. (quoting *Chaney,* 483 F.3d at 1227) (internal quotations omitted). "Therefore, in ruling on a party's renewed motion under Rule 50(b) after the jury has rendered a verdict, a court's sole consideration of the jury verdict is to assess whether that verdict is supported by sufficient evidence." *Id*. (quoting *Chaney*, 483 F.3d at 1227) (internal quotations omitted).

"Judgment as a matter of law is appropriate when [the non-movant] presents no legally sufficient evidentiary basis for a reasonable jury to find for him on a material element of his cause of action." *Id*. (quoting *Williams v. First Advantage LNS Screening Sols. Inc.*, No. 17-11447, 947

2

Fed. 3d 735, 744 (11th Cir. 2020)) (internal quotations omitted). "If there is a substantial conflict in the evidence, such that reasonable and fair-minded persons exercising impartial judgment might reach different conclusions, the district court must deny the motion." *Id*. (quoting *Williams*, No. 17-11447, 947 Fed. 3d at 744).

Plaintiff alleged the Defendant, Dr. Manuel Pouparinas, was deliberately indifferent to his serious medical need while Plaintiff was incarcerated at Fountain Correctional Facility, exacerbating a preexisting condition, and resulting in partial amputation of his foot. Dr. Pouparinas was medical director at Fountain and in charge of medical care for Fountain prisoners on behalf of Wexford Health Sources, the contracted medical provider for the Alabama Department of Corrections.

As set out in the jury charges, a claim for deliberate indifference has five elements:

(1) That Plaintiff had a serious medical need;

(2) That Dr. Pouparinas knew Plaintiff had a serious medical need that posed a risk of serious harm;

(3) That Dr. Pouparinas failed to provide necessary medical care for Plaintiff's serious medical need in deliberate indifference to the risk of serious harm;

(4) That Dr. Manuel Pouparinas' conduct caused Plaintiff's injuries; and

(5) That Dr. Manuel Pouparinas acted under color of law.

Ex.A, no. 3[1]; *see also* 11th Circuit Jury Instructions 5.8 (2020).

Defendant stipulated to elements 1 and 5 before the case went to the jury. Moreover, Defendant's argument for Judgment as a Matter of Law addresses only the sufficiency of the evidence in relation to element 3—Dr. Pouparinas's abject failure to provide necessary medical

---

[1] Jury Instructions from this trial.

care in deliberate indifference to the risk of serious harm.

As set out in the jury instructions, the third element involves consideration of "all the relevant circumstances including the seriousness of Mr. Moye 's injury, the length of any delay in providing Mr. Moye 's medical care, and the reasons for any delay." Ex.A, no.3; *see also* 11th Circuit Jury Instructions 5.8 (2020).

It is undisputed that the osteomyelitis infection in question was serious, and that time was of the essence in treating this bone infection.

In his argument, Defendant relies heavily on *Wade v. McDade*, 67 F.4th 1363 (11th Cir. 2023), despite the fact that the decision has been vacated by the Eleventh Circuit for a rehearing en banc, and thus carries no precedential value. Moreover, Defendant cites primarily to the medical records that have been in the record since the summary judgment stage and which the Court already has considered in denying summary judgment as to Dr. Pouparinas. And here, as elsewhere, Defendant misstates evidence in key ways and offers conclusory pronouncements that the record evidence and testimony contradicts.

Among the facts established at trial, Canyon Moye ("Canyon") developed osteomyelitis in his left foot prior to his incarceration as a result of an injury. Osteomyelitis is a serious bone infection that can cause inflammation or swelling. It can be acute or chronic and can be caused by an infection that spreads to the bone from somewhere else in the body, or it can start in the bone itself. As described in the medical records and the testimony of Canyon, his prior treating doctors, Dr. Paul and Dr. Dull, and Plaintiff's expert, Dr. Verdura, Canyon received treatment three times over the 2.5 years leading up to his incarceration at Fountain, and each time—in 2017, 2018, and 2019, Canyon's wound healed. The three previous flareups healed because in each of the three previous treatments, the doctors did a culture of Canyon's wound on the very first visit; this culture

identified the bugs that were present; and then the doctors prescribed an IV/Picc line with the type of drug that would kill the bug. As testified by all of the doctors who testified at trial—including Dr. Pouparinas—when dealing with a serious infection, "you have to match the drug with the bug."

Wexford Health Sources, the corporation which provides staffing and medical care for prison systems throughout the nation, employed Dr. Pouparinas at the time of Canyon's incarceration, as well as all of the nurses who worked in the Alabama prison system. Canyon was transferred into the state prison system on August 28, 2019, when he went to Kilby Correctional for one month. Kilby is a processing facility that conducts testing, medical history questionnaires and physical examinations to ensure the prisoner can safely proceed into the prison population. The medical history and medical exam documents from Kilby show that Canyon had no wounds, no injuries, and no signs of infection. Canyon's medical history showed that he had a history of an osteomyelitis infection to his left foot. Plaintiff's Trial Ex. 3A. This history served as notice to all treating healthcare providers in the state system that Canyon had a history of bone infection in his left foot that needed to be taken seriously, particularly if there was a flareup in the same area.

While at Kilby, Canyon was issued hard-soled work boots which caused a blister on the bottom of his left foot – the same place where he had previous infections causing the IV/Picc line treatment. Canyon saw the nurse at Kilby on October 2, 2019, and the nurse at Kilby ordered him to stay off his feet for an indefinite time period. Trial Ex. 3A, p. 119.

October 4, 2019, Canyon was transferred to Fountain, and his records from Kilby were transferred with him. On the day he arrived at Fountain, Canyon was concerned about his foot and sought medical care immediately. He saw the nurse, indicating the following: "I have an infected hole in my foot that is leaking green puss in my sock." Trial Ex. 3B. The nurse noted Canyon's history of osteomyelitis. Canyon's concern about the condition of his foot was supported by

5

evidence that he spoke to his parents on October 6, 2019, about his concerns, and later that day texted a photograph of his foot to his parents, showing early signs of an infection. Trial Ex.1. This photograph shows a single black sore on Canyon's foot, below the second and third toes. As later photographs show, because Dr. Pouparinas ignored Canyon's infection, the wound grew exponentially, and also expanded to a second wound at the base of his big toe. *Id*.; *see also* Trial Ex.2; Trial Ex.22.

On October 7, 2019, Canyon was first seen by Dr. Pouparinas – and that very first visit is the first act of deliberate indifference by Dr. Pouparinas. Dr. Pouparinas noted the visit was for a foot injury with a history of osteomyelitis, indicating his knowledge of a serious medical condition needing specific and effective medical treatment without delay. Trial Ex. 3C, p. 1715. Dr. Pouparinas confirmed at trial that he was knowledgeable about osteomyelitis and acknowledged it was a serious infection. Despite this, Dr. Pouparinas chose not to conduct a culture of the wound, as is not only common practice, but necessary in order to determine what bugs he was dealing with, and he put Canyon on Augmentin -- an antibiotic that has no effect on three out of the four bugs that Canyon was infected with.[2] He simply prescribed an antibiotic at random without performing any of the necessary lab work to determine the nature of the infection. Dr. Pouparinas also chose not to follow the nurse's instructions from October 2, 2019, allowing Mr. Moye to continue to put pressure on his infected foot.

As a result of this deliberate indifference, Canyon's infection continued to grow, dissolve bone, and eat up tissue. The only treatment provided to Canyon for the next several weeks was a cleaning of the wound and soaking in Epson salt. Plaintiff's wound care expert, Dr. Nicholas Verdura, testified that Epson salt is essentially useless in treating infections such as Canyon's, and

---

[2] A lab culture returned on November 25, 2019, identified the four bacteria or "bugs" that infected Canyon's foot wound. *See* Trial Ex.3E.

that the treatment would have been ineffective against the primary source of Canyon's infection—Pseudomonas Aeruginosa ("Pseudomonas"). Throughout Canyon's incarceration at Fountain, his infection kept spreading and getting worse as his bones and tissue were being eaten by the infection, but Dr. Pouparinas never altered this initial uninformed and ineffective course of treatment.

The next egregious act of deliberate indifference occurred on November 15, 2019. On that day, the nurse practitioner noted that Canyon's wound was stinky and green/yellow ooze was coming out of it, which medical providers confirmed were obvious signs of a serious infection. Appropriately, the nurse practitioner realized the seriousness of the infection and ordered Canyon to be admitted into the infirmary for two weeks with a Picc Line/ IV and lab work. The IV treatment order called for administration of Zosyn – a drug established at trial to be effective to kill the dangerous bug Pseudomonas. It was also shown at trial that an IV treatment with a drug that could kill Pseudomonas had healed Mr. Moye on the three previous occasions when his foot had become infected. But for some unknown reason, on the very same day the nurse ordered Canyon's admission to the infirmary and IV treatment, Dr. Pouparinas chose to reverse the order for Zosyn and Canyon's two weeks of IV treatment. Instead, Dr. Pouparinas sent Canyon back into the prison population with an order to continue him on Augmentin pills – the same ineffective treatment that had not worked for the past five weeks as his infection spread. Trial Ex.3D. As a result of this deliberate indifference, Mr. Moye's infection continued to grow, eat tissue, and dissolve bone.

At trial, Dr. Pouparinas admitted that at the time that Canyon appeared for this November 15 visit, the following was true:

- Dr. Pouparinas knew that that Mr. Moye had a serious medical condition which required immediate medical attention;

- Dr. Pouparinas knew that Zosyn would work to kill the bug Pseudomonas;

- Even though the nurse practitioner ordered am immediate Zosyn IV that day, Zosyn was never administered; and

- When a doctor is reversing a nurse practitioner's orders, it is important to document that reversal and explain why the doctor reversed the nurse's orders.[3]

Dr. Pouparinas also agreed at trial that if a jury believed he chose to reverse the nurse practitioner's November 15 orders, such behavior would amount to "reckless indifference" to Mr. Moye's serious medical needs.

The Court will recall that all of the above facts were written on a large notepad in view of Dr. Pouparinas and the jury -- Dr. Pouparinas agreed to all of the above facts, and so the word "AGREED" was written below each stated fact.

At trial, Dr. Pouparinas attempted to claim—for the first time after two years of litigation—that he canceled Canyon's treatment because Canyon refused the treatment. Dr. Pouparinas pointed to a small "R" typed into an electronic medical record ostensibly showing that Mr. Moye refused treatment on November 15, 2019, and put himself back into population. However, Plaintiff demonstrated that the electronic medical record on which Dr. Pouparinas based his newfound claim was wholly unreliable—several other similar electronic medical records, ostensibly indicating Canyon did not receive a given treatment, were shown to be directly contradictory to <u>handwritten</u> medical records taken contemporaneously on the day of each treatment. Moreover, there was substantial evidence indicating Canyon was concerned about his injury and was trying to obtain treatment—including his own testimony and that of his father, who made numerous calls

---

[3] The evidence showed no explanation as to why Dr. Pouparinas canceled the hospital stay, canceled the Zosyn treatment, and instead sent Canyon back into population with the same treatment which was completely ineffective.

during Canyon's time at Fountain to state officials, the prison wardens, and others seeking medical attention for his son. There were also photos taken by Canyon and sent to loved ones showing the deterioration of his foot during his time at Fountain—photos he sent out of concern for his own well-being. There is also the fact that Canyon sought medical attention from his first day at Fountain, and there was evidence in the form of Canyon's own writing on prison forms asking for help. Both of Canyon's prior doctors testified regarding his prior treatment and neither indicated Canyon had been anything but diligent about his treatment in the past.

There was an enormous amount of evidence and testimony to support that Canyon diligently sought treatment for his foot and no credible evidence to support that he refused the same. Dr. Pouparinas' testimony lacked credibility in a number of other ways as well. It was erratic, internally contradictory, and obviously self-serving. He also contradicted his prior testimony in other aspects, some of which were addressed at trial.

The third egregious act of deliberate indifference came on November 25, 2019. As noted, the nurse practitioner ordered a lab culture of Canyon's wound during the November 15 visit described above. Dr. Pouparinas testified that he was familiar with the bug Pseudomonas and that he was familiar with lab results which show all healthcare providers not only what bugs are present in a wound, but also tell the provider which drugs are effective against each identified bug. Dr. Verdura noted at trial that a person did not need medical training to simply read the lab culture results and then prescribe the medicine indicated effective against the bugs. The results of the lab culture came back on November 25, 2019, showing the existence of four bugs, with the most dangerous bug being the Pseudomonas (Trial Ex.3E). Augmentin was not listed as an effective drug under the bug Pseudomonas, and Augmentin was not listed for three out of the four bugs listed on Trial Ex.3E. But Dr. Pouparinas continued Canyon on Augmentin, knowing that

Augmentin had no effect on Pseudomonas. As a result of this deliberate indifference, Canyon's infection continued to grow, eat tissue, and dissolve bone. Contrary to Defendant's argument, this was not a question of whether Canyon simply wanted a different course of treatment. Dr. Pouparinas' deliberate choices amounted to no treatment at all.

The fourth act of deliberate indifference came in December 2019. Mr. Moye saw his wound continuing to grow unchecked and on December 8, 2019, he texted his parents another photograph of his left foot, demonstrating that his foot had decayed morbidly and had a hole in it. Trial Ex.22. On December 16, 2019, Dr. Pouparinas at last realized that he could not effectively treat Canyon's wound on his own and ordered Canyon to see an outside general surgeon. Trial Ex.3I. Even there, however, Dr. Pouparinas' deliberate delays exemplified further indifference. As the evidence and Dr. Dr. Pouparinas' testimony supports, Dr. Pouparinas had two options to get Canyon outside treatment: He could send him to the ER immediately and the ER would call a surgeon or wound care specialist in to see Canyon, or he could fill out a form seeking approval from the Wexford higher-ups and wait. Dr. Pouparinas chose to fill out the form and wait, despite the condition of Canyon's foot. On the form, Dr. Pouparinas described Canyon's wound as a "routine" medical need. On the form, he could have identified the request as "urgent," and the approval process would take one to two days. Trial Ex.3I. By describing the wound as "routine," Dr. Pouparinas knew that the approval process could take up to one week. The approval was granted by Wexford two days later, but Dr. Pouparinas then chose to schedule the appointment with a general surgeon for January 7, 2020—more than three weeks later. Delay in treatment is an element of deliberate indifference. Dr. Pouparinas' actions demonstrate a lack of concern coupled with a delay in treatment.

By the time of Canyon's January 7 visit with the general surgeon, Dr. Paul, it had been more than three months since Canyon first went to see a Wexford nurse at Fountain, and exactly

three months after Dr. Pouparinas' first visit with Canyon. During this time, no medication had been prescribed that would kill the bug Pseudomonas despite its availability. This deliberate indifference caused Mr. Moye's wound to grow unchecked, eating away bone and flesh. On January 7, 2020, Mr. Moye texted his parents with another photograph of his wound, showing the continuation of the bacterial growth. Trial Ex.2.

On January 7, 2020, the general surgeon finally ordered an MRI of Canyon's left foot—the first MRI ordered since Canyon arrived at Fountain. Trial Ex. 30. The MRI was not performed until January 21, 2021. Dr. Verdura testified that an MRI should have been ordered on Canyon's first visit to the infirmary in early October. By the time an MRI was done, Canyon's foot had deteriorated so badly that the interpreting radiologist noted, mistakenly, that four of Canyon's toes had been amputated.[4] It was explained at trial that the reason for this mistake by the radiologist was that the untreated infection had eaten away four of Canyon's toes to the point that there was no bone left, making them appear amputated on an MRI. The results of this MRI can be compared to previous X-rays and MRI's, which showed bones intact for all of Canyon's toes: the X-ray taken on October 7, 2019 identified bones in Mr. Moye's toes; Dr. Dull also testified that the X-ray and MRI which he ordered in March of 2019 showed all of Mr. Moye's toes intact. Trial Ex. 26.

Canyon's Alleged Non-Compliance with his Medical Treatment:

Dr. Pouparinas attempted to blame Canyon for neglecting his own treatment by intentionally missing treatments and doctor appointments at Fountain. Canyon testified that he never chose to miss an appointment. On the occasions that he did miss an appointment, there was either a lockdown in the prison or the guards simply would not let him go to medical. Canyon testified that he told Dr. Pouparinas and the Wexford nursing staff that he was not allowed to come

---

[4] "Multifocal amputations of the 1st through 4th rays as described." Trial Ex.30.

11

to medical, but Dr. Pouparinas and the nursing staff did not seem to care, and they did nothing to assist. Canyon further testified that he spoke with his parents every day and expressed fear and that he was not getting adequate medical treatment. As set out above, Canyon's father, Duff Moye, testified that in the first few months Canyon was at Fountain, he frantically tried to get his son adequate treatment. Several times per week for those first few months, Duff Moye called the warden at Fountain, Governor Kay Ivey's office, and the head of the Alabama Department of Corrections, trying to get his son adequate medical treatment. Testimony by Canyon's mother further supported Canyon's concerns about his foot and his efforts to obtain treatment.

As the medical director at Fountain and Canyon's doctor, Dr. Pouparinas had the authority to call the guards and deliver Canyon to the medical clinic at any time – but he never did. Dr. Pouparinas also had the responsibility to sit down with Canyon and figure out why he was missing appointments and inform Canyon of the consequence of missing appoints – but he never did, despite his awareness that Canyon and other inmates had indicated they were unable to get to the medical clinic.

Mentions of Potential Amputation in Medical Records Prior to Fountain:

Before Canyon went to Fountain, Both Dr. Dull and Dr. Paul told Canyon that he may have to have an amputation if his foot gets worse. But both of these doctors followed the protocol when they treated Canyon – they always matched the drug to the bug, and each time Canyon's foot got better, eliminating the need for amputation. Importantly, Dr. Dull was the last doctor to treat Canyon before his incarceration at Kilby and Fountain—he had seen Canyon just over two months before he went to Kilby Correctional. Dr. Dull testified that upon their last visit, Canyon's wound was healed, and the infection was gone. Dr. Dull testified that Canyon had a 25 percent chance of the infection happening again, but a 75 percent chance that he would have a healthy foot from that

point forward.

It is undisputed that Dr. Pouparinas knew from Canyon's first day at Fountain that Canyon had a history of osteomyelitis, and that Canyon's foot needed medical attention. Yet Dr. Pouparinas failed him at every turn, by failing to order an MRI, and by failing to order a lab culture to identify the type of bugs infecting Canyon's foot. Instead, Dr. Pouparinas prescribed an ineffective antibiotic—and continued to prescribe months later, despite the demonstrable deterioration of Canyon's foot. Photos taken by Canyon show the progression of his foot's deterioration, while the medical records show a chronic failure to provide care during the same time frame. By the time, the first MRI was ordered, the bones in four of Canyon's toes had been completely eaten away. The evidence and testimony at trial was more than sufficient to support the finding that Dr. Pouparinas was deliberately indifferent to Canyon's medical needs. Additionally, Dr. Pouparinas did not provide any rationale for his failure to order proper assessments of Canyon's wound—any lab work, a wound culture, or an MRI—for many weeks, or why, after finally obtaining lab work and a wound culture, he failed to use the information to alter his ineffective oral antibiotic treatment. His primary defense at trial was that Canyon had failed to show up for his treatments and that he had refused IV antibiotics when a nurse finally ordered it. However, as set out above, there was significant evidence presented contradicting these assertions.

In his motion, Defendant cites cases involving osteomyelitis, but those cases, in other courts, center on failure to diagnose it in the first instance—that is not the case here. It is indisputable that Dr. Pouparinas was aware of Canyon's history of osteomyelitis from Canyon's first visit to the medical clinic on his first day in Fountain. Moreover, Dr. Pouparinas never testified to any lack of awareness, either of Canyon's prior medical history or of the medical condition itself. He simply failed, deliberately, to treat it, despite the dire consequences that could result.

13

In light of the foregoing, Defendant's renewed motion for judgment as a matter of law should be denied.

Respectfully submitted,

*/s/ Edward P. Rowan*
EDWARD P. ROWAN

OF COUNSEL:

Taylor Martino Rowan
P. O. Box 894
Mobile, Alabama 36601
(251) 433-3131
ed@taylormartino.com
*Attorney for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this the 1st day of July 2024, I have filed the foregoing document electronically via the CM/ECF system which will send notification to all counsel of record.

*/s/ Edward P. Rowan*
